Sean T. LACHENMAN, as Personal Representative for the Estate of Chere Lachenman, Appellant–Plaintiff,

v.

Mitchell STICE and Josephine Stice, Appellees–Defendants.

No. 15A01–0503–CV–113.

Court of Appeals of Indiana.

Nov. 30, 2005.

Rehearing Denied Jan. 6, 2006.

Douglas C. Holland, Lawrenceburg, for Appellant.

M. Michael Stephenson, McNeely, Stephenson, Thopy & Harrold, Shelbyville, for Appellees.

**OPINION**

SULLIVAN, Judge.

Appellant–Plaintiff, Sean T. Lachenman, as the personal representative of the estate of Chere Lachenman ("Lachenman"), challenges the trial court's grant of partial summary judgment in favor of Appellee–Defendants, Mitchell Stice and Josephine Stice (collectively "the Stices"), and also challenges the trial court's rulings on the Stices' motion in limine. Upon appeal, Lachenman claims that summary judgment was improperly granted because there are genuine issues of material fact as to whether Lachenman may recover on her claims of intentional and negligent infliction of emotional distress and that the trial court erred in ruling to exclude evidence regarding the vicious propensity of the Stices' dogs and the value of Lachenman's pet dog.

We affirm.

The record reveals that at the time relevant to this appeal, Lachenman and the Stices lived in the Hidden Valley Lake housing addition in Lawrenceburg, Indiana.[1] Lachenman owned lots 2978 and

1. The "Statement of Facts" section of Lachenman's appellant's brief consists of verbatim quotations from three affidavits submitted by Lachenman in support of her motion for partial summary judgment. We would direct Lachenman's counsel to Indiana Appellate

2979, and the Stices lived on lot 2976. Apparently separating their lots is lot 2977, owned by Gary L. Miller. Lachenman owned a Jack Russell terrier. The Stices owned a German Shepard dog and an English bulldog. Prior to the incident which led to the case upon appeal, the Stices' dogs ran loose, and on one occasion, chased Lachenman's dog onto the deck attached to her house. Although Lachenman in her affidavit describes this incident as an "attack," during her deposition, she explained that the Stices' dogs came running toward her deck, where her dog was, and that she had to restrain the Stices' dogs by holding onto their collars. There is no indication that Lachenman's dog was injured during this incident.

On September 30, 2002, Lachenman was on her deck with her dog when she was distracted by a telephone call from work. Lachenman went inside her house for seven to eight minutes, and after she hung up the phone, she heard a "horrible" noise. Realizing the noise was the being made by a dog, Lachenman went back onto her deck and saw the Stices' dogs attacking her dog in the lake which abuts Lachenman's property.[2] The Stices' dogs were standing in shallow water, and Lachenman's dog was swimming, trying to get back to land. Whenever Lachenman's dog got near the shore, the Stices' dogs would attack it. Mrs. Stice was standing near her dogs, holding leashes which were not attached to her dogs' collars.[3] Lachenman eventually went into the water, and called to her dog, but the Stices' dogs would not release it. Eventually, the dogs let go,

and Lachenman's dog swam to her. Lachenman took her dog to the veterinarian to treat its wounds. The veterinarian treated the dog's wounds, but the terrier died on October 3, 2002. No person was bitten or otherwise hurt during this incident.

After this incident, the Hidden Valley Lake Property Owner's Association declared the Stices' German Shepard dog a "vicious" dog and fined the Stices for failing to follow the Association's guidelines.

On December 3, 2002, Lachenman's neighbor, Mr. Miller, was in his attached garage unloading his truck with his dogs approximately fifteen feet away from him in his front yard. Mr. Stice opened his garage door, and his German Shepard came running at Mr. Miller's dogs. Mr. Miller called his dogs into the garage, but Mr. Stice's dog came into the garage and mauled one of Mr. Miller's Pomeranian dogs. Mr. Stice attempted to pull his dog off of Mr. Miller's dog, punching his dog in the side. Mr. Stice's dog bit Mr. Stice in the hand, causing him to bleed as he continued to hit his dog. As Mr. Stice finally got a hold of his German Shepard dog and began to lead it away with a choke chain, his English bulldog came running into Mr. Miller's garage. Mr. Miller grabbed at this dog, which lunged at his face, knocking Mr. Miller down as he threw the dog out of the way. The bulldog followed Mr. Stice away. Mr. Miller took his injured dog to an animal hospital. It had broken ribs, had to have cuts stitched, and had tubes placed in its side.

Rule 46(A)(6)(c), which provides that the statement of facts "shall be in *narrative* form and shall not be a witness by witness summary of the testimony." (emphasis supplied).

**2.** Mrs. Stice stated in her deposition that it was Lachenman's terrier which was the aggressor. For purposes of summary judgment,

however, we must consider the facts in the light most favorable to the non-moving party, Lachenman.

**3.** Lachenman stated that Mrs. Stice said she eventually jumped in the water and grabbed her dogs.

On April 19, 2003, the Stices' German Shepard dog attacked and mauled another dog, one belonging to Wende Penny, who apparently also lives near the Stices. This attack occurred on Ms. Penny's property, and neither of the Stices' dogs was on a leash.

On February 19, 2003, Lachenman filed a complaint against the Stices. The complaint alleged that the Stices were liable pursuant to Indiana Code § 15–5–12–1 (Burns Code Ed. Repl.2005). The complaint also alleged that due to the Stices' "negligent and intentional acts," Lachenman suffered veterinary bills of $172.00, "[p]ersonal fear of attack by [the Stices'] dogs," "[e]motional distress due to the violent death of the [Lachenman]'s pet," "[e]motional distress and fear for [Lachenman's] own safety and the safety of her pets and the safety of her visitors, especially children," and "[l]oss of future breeding income . . . ." Appellant's Appendix at 16–17. The complaint further sought a protective order requiring the Stices to comply with the Hidden Valley Lake dog control guidelines, and $100 damages for every day the defendants were in violation of the Hidden Valley Lake guidelines. Lastly, the complaint alleged that the Stices had intentionally or knowingly committed criminal acts pursuant to Indiana Code § 15–5–12–3 (Burns Code Ed. Repl.2005) and that Lachenman was therefore entitled to punitive damages of at least $10,000.

On November 13, 2003, the Stices filed a motion for partial summary judgment with regard to Lachenman's claims of intentional infliction of emotional distress, negligent infliction of emotional distress, punitive damages, the issue of future breeding income, the claims involving statutory violations, and the request for a protective order. After being granted an extension of time in which to respond to the summary judgment motion, Lachenman filed her response on February 12, 2004. After both parties filed supplemental materials, the trial court held a hearing upon the summary judgment motion on April 1, 2004.[4] On May 6, 2004, the trial court entered an order granting partial summary judgment in favor of the Stices. In preparation for trial for the remaining issue, the Stices filed on November 8, 2004, a motion in limine seeking to exclude, among other things, evidence regarding the incidents which occurred after the attack which killed the Lachenman's dog. The court granted the motion in limine on November 16, 2004. On January 10, 2005, Lachenman filed a motion for partial final judgment, asking the trial court to make its rulings final pursuant to Indiana Trial Rule 54(B).

On January 12, 2005, the trial court entered an order of final judgment on specific issues, which stated in part:

"The Court entered Partial Summary Judgment on May 6, 2004, and the Parties appeared for Jury Trial on November 16, 2004, where the Court entered rulings on Defendants' Motion in Limine and Ordered that specific evidence would be excluded from the Trial. The Court's position was that if the Court's rulings are correct, then it would be a waste of effort to proceed with a Jury Trial and conversely if the Court's ruling[s] were incorrect, the Plaintiff would be entitled to a new trial, whereby the Parties agreed to continue the Jury Trial so that Plaintiff could file a Motion to obtain the Court's Final Rulings and for a specific partial Final Judgment on the contested Rulings under Trial Rule 56(C) and Trial Rule 54(B). The Court joins with the Parties in requesting Ap-

---

4. No transcript of the hearing was included with the materials before us.

pellate Review of the Court's rulings in this case so that the Jury Trial will be according to the proper legal standards giving both Parties a legally fair trial." Appellant's App. at 8.

Lachenman subsequently filed a Notice of Appeal on February 11, 2005. Upon appeal, Lachenman challenges both the trial court's grant of partial summary judgment and the evidentiary rulings incorporated into the final judgment.

## I

### Summary Judgment

Summary judgment is appropriate only where the designated evidentiary materials demonstrate that there are no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Rector v. Oliver*, 809 N.E.2d 887, 889 (Ind.Ct.App.2004) (citing Ind. Trial Rule 56(C)). When reviewing a grant of a motion for summary judgment, we stand in the shoes of the trial court. *Id.* Once the moving party demonstrates, prima facie, that there are no genuine issues of material fact as to any determinative issue, the burden falls upon the non-moving party to come forward with contrary evidence. *Id.* Upon appeal, we do not weigh the evidence but rather consider the facts in the light most favorable to the non-moving party. *Id.*

### A. Intentional Infliction of Emotional Distress

■ Lachenman claims that the trial court erred in granting summary judgment in favor of the Stices with regard to her claims of intentional infliction of emotional distress. The tort of intentional infliction of emotional distress was first rec-

ognized as a separate cause of action without the need for an accompanying tort in *Cullison v. Medley*, 570 N.E.2d 27 (Ind.1991). *See City of Anderson v. Weatherford*, 714 N.E.2d 181, 185 (Ind.Ct. App.1999). In *Cullison*, our Supreme Court defined the tort of intentional infliction of emotional distress as: " 'one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress ....' " *Id.* at 31 (quoting Restatement (Second) of Torts § 46 (1965)). It is the intent to harm the plaintiff emotionally which constitutes the basis for the tort of intentional infliction of emotional distress.[5] *Id.* The elements of the tort are that the defendant: (1) engages in extreme and outrageous conduct (2) which intentionally or recklessly (3) causes (4) severe emotional distress to another. *Branham v. Celadon Trucking Servs., Inc.*, 744 N.E.2d 514, 523 (Ind.Ct.App.2001); *Bradley v. Hall*, 720 N.E.2d 747, 752 (Ind.Ct.App.1999). The requirements to prove this tort are rigorous. *Branham*, 744 N.E.2d at 523. Our cases have cited with approval the following comment:

> " 'The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency,

---

5. It may be noted that a demonstrated intent to harm seems inconsistent with mere reck- less conduct.

and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Bradley,* 720 N.E.2d at 752–53 (quoting Restatement (Second) of Torts § 46). Intentional infliction of emotional distress is found where conduct exceeds all bounds usually tolerated by a decent society and causes mental distress of a very serious kind. *Branham,* 744 N.E.2d at 523. In the appropriate case, the question can be decided as a matter of law. *Id.*

■ Here, considering the facts in the light most favorable to Lachenman as the non-moving party, we can conclude as a matter of law that the Stices' actions do not constitute "outrageous" behavior as contemplated by the narrow definition adopted from the Restatement. In other words, however negligent the Stices' behavior may have been, we cannot say that it was so extreme in degree as to go beyond all possible bounds of decency, and should be regarded as atrocious and utterly intolerable in a civilized society. *See Bradley,* 720 N.E.2d at 752–53. Moreover, there is also nothing in the record which would support a reasonable inference to the effect that the Stices intended to cause Lachenman emotional distress by their behavior. *See Cullison,* 570 N.E.2d at 31 (intent to cause emotional harm to plaintiff constitutes basis for the tort of intentional infliction of emotional distress). The trial court did not err in granting summary judgment to the Stices upon Lachenman's claim of intentional infliction of emotional distress.

### B. Negligent Infliction of Emotional Distress

Lachenman also claims that the trial court erred in granting summary judg-ment to the Stices with regard to her claim of negligent infliction of emotional distress. Indiana case law dealing with this subject has been evolving in recent years. Traditionally, Indiana courts analyzed claims for negligent infliction of emotional distress under the "impact" rule. *Ryan v. Brown,* 827 N.E.2d 112, 119 (Ind.Ct.App.2005). Under the traditional impact rule, a plaintiff could not recover for emotional damages unless the emotional distress was accompanied by and resulted from a physical injury caused by an impact to the plaintiff. *Id.* In *Shuamber v. Henderson,* 579 N.E.2d 452, 456 (Ind.1991), our Supreme Court modified the impact rule, holding that when:

"a plaintiff sustains a direct impact by the negligence of another and, by virtue of that direct involvement sustains an emotional trauma which is serious in nature and of a kind and extent normally expected to occur in a reasonable person[,] ... such a plaintiff is entitled to maintain an action to recover for that emotional trauma without regard to whether the emotional trauma arises out of or accompanies any physical injury to the plaintiff."

Following *Shuamber,* cases continued to interpret the modified impact rule as requiring a direct physical impact. *See, e.g., Comfax Corp. v. N. Amer. Van Lines, Inc.,* 587 N.E.2d 118 (Ind.Ct.App.1992); *Roe v. N. Adams Comm. Sch. Corp.,* 647 N.E.2d 655 (Ind.Ct.App.1995); *Miller v. May,* 656 N.E.2d 1198 (Ind.Ct.App.1995); *Etienne v. Caputi,* 679 N.E.2d 922 (Ind.Ct.App.1997), *disapproved of by Alexander v. Scheid,* 726 N.E.2d 272 (Ind.2000); *Dollar Inn, Inc. v. Slone,* 695 N.E.2d 185 (Ind.Ct.App.1998), *trans. denied; Holloway v. Bob Evans Farms, Inc.,* 695 N.E.2d 991 (Ind.Ct.App. 1998); *Firstmark Std. Life Ins. Co. v.*

*Goss*, 699 N.E.2d 689 (Ind.Ct.App.1998); *Rivera ex rel. Rivera v. City of Nappanee*, 704 N.E.2d 131 (Ind.Ct.App.1998); *Ross v. Cheema*, 716 N.E.2d 435 (Ind.1999).

On the same day that our Supreme Court decided *Ross, supra*, it also handed down *Conder v. Wood*, 716 N.E.2d 432 (Ind.1999). In that case, plaintiff Wood was walking with her co-worker and friend, Brittain. The two came to the intersection of two streets, and began to cross the street after the pedestrian "walk" sign appeared. As they crossed, defendant Conder, who was driving a truck, struck Brittain, hurling her to the pavement. Fearing that the truck would further crush her friend as it moved forward, Wood pounded on the side of the truck in an attempt to get the driver's attention. Although the truck came to a stop just before it ran over Brittain's head, she died at the scene. Wood sued Conder for, among other things, negligent infliction of emotional distress. The trial court denied Conder's motion for summary judgment. Upon transfer, our Supreme Court discussed the modified impact rule from *Shuamber*, and stated that the rule "maintains the requirement of a direct physical impact." *Conder*, 716 N.E.2d at 434. The court also addressed the plaintiff's claim that she sustained a direct impact by pounding on the side of the truck, stating:

> " 'direct impact' is properly understood as the requisite measure of 'direct involvement' in the incident giving rise to the emotional trauma. Viewed in this context, we find that it matters little how the physical impact occurs, so long as that impact arises from the plaintiff's direct involvement in the tortfeasor's negligent conduct." *Id.* at 435 (footnote omitted).

The court held that Wood clearly sustained an "impact" by pounding on the truck, that she suffered emotional trauma as a result

of her direct involvement in Conder's negligence, and that Conder was therefore not entitled to judgment as a matter of law. *Id.*

After the *Conder* decision, the court held in *Alexander v. Scheid*, 726 N.E.2d 272 (Ind.2000), that destruction of healthy tissue as a result of defendant's alleged medical malpractice was sufficient physical impact under the modified impact rule.

The next significant development in the law of negligent infliction of emotional distress occurred in *Groves v. Taylor*, 729 N.E.2d 569 (Ind.2000). In *Groves*, our Supreme Court adopted what has been referred to as the "bystander" or "relative bystander" rule. In that case, the plaintiff, an eight-year-old girl, watched her brother cross a highway to get the mail. The plaintiff turned away from her brother to walk back to her house when she heard a loud "pop." *Id.* at 571. She turned around and although she did not see the impact, did see her brother's body roll off the highway as a result of being hit by a car. Upon transfer from an affirmance of summary judgment in favor of the defendants, our Supreme Court noted that it was undisputed that the plaintiff had not suffered the kind of "direct impact" required by the impact rule as modified in *Shuamber*. *Groves*, 729 N.E.2d at 572. The court nevertheless held that:

> "the reason for requiring direct involvement is to be able to distinguish legitimate claims of emotional trauma from the mere spurious. The value of requiring 'direct impact' is that it provides clear and unambiguous evidence that the plaintiff was so directly involved in the incident giving rise to the emotional trauma that it is unlikely that the claim is merely spurious." *Id.*

After analyzing a Wisconsin case involving

similar facts,[6] the *Groves* court held:

"where the direct impact test is not met, a bystander may nevertheless establish 'direct involvement' by proving that the plaintiff actually witnessed or came on the scene soon after the death or severe injury of a loved one with a relationship to the plaintiff analogous to a spouse, parent, child, grandparent, grandchild, or sibling caused by the defendant's negligent or otherwise [tortious] conduct." *Id.* at 573.

In *Bader v. Johnson*, 732 N.E.2d 1212 (Ind.2000), a case decided later that year, Mrs. Johnson, who had previously given birth to a child with hydrocephalus, sought consultation from Dr. Bader, but Dr. Bader's office failed to schedule her for follow-up treatment and failed to forward ultrasound results to Mrs. Johnson's treating physician, which results indicated that the child she was carrying also had hydrocephalus. When Mrs. Johnson's treating physician eventually detected the abnormalities, it was too late to terminate the pregnancy. Mrs. Johnson later gave birth to a child with multiple birth defects who died after four months. The Johnsons sued Dr. Bader and her employer, and the trial court denied the defendants' motion for summary judgment. Upon transfer, our Supreme Court again discussed the evolution of the impact rule, noting that the modified impact rule still required "physical impact." *Id.* at 1221. Applying the rule to the facts of that case, the court held that Mrs. Johnson's "continued pregnancy and the physical transformation her body underwent as a result satisf[ied] the direct impact requirement of our modified impact rule." *Id.* at 1222. With regard to Mr. Johnson's claims, however, the court held that he suffered no direct impact. *Id.* Nevertheless, the court remanded to allow him to present evidence that he fit within

the "relative bystander rule" adopted in *Groves. Bader,* 732 N.E.2d at 1222.

Thus, after our Supreme Court had further expanded the possibility of recovery for negligent infliction of emotional distress by adoption of the bystander rule in *Groves,* it reaffirmed that the modified impact rule still required physical impact in *Bader.* Several subsequent cases from this court have required a direct physical impact under the modified impact rule. *See Munsell v. Hambright,* 776 N.E.2d 1272 (Ind.Ct.App.2002) (holding that where designated evidence revealed no impact of any kind upon plaintiff, and plaintiff did not fit within bystander rule, summary judgment was properly entered for defendants upon plaintiff's claim of negligent infliction of emotional distress); *Powdertech, Inc. v. Joganic,* 776 N.E.2d 1251 (Ind. Ct.App.2002) (noting that modified impact rule requires physical impact, court held that summary judgment should have been granted to defendant upon plaintiffs' claim of negligent infliction of emotional distress resulting from employer's act of firing employee pursuant to employment policy); *Ritchhart v. Indianapolis Pub. Schs.,* 812 N.E.2d 189 (Ind.Ct.App.2004) (holding that summary judgment was properly entered for defendant school corporation on plaintiff's claim of negligent infliction of emotional distress where no physical impact occurred and bystander rule was inapposite); *cf. Ketchmark v. N. Ind. Pub. Serv. Co.,* 818 N.E.2d 522 (Ind.Ct.App.2004) (summary judgment properly entered in favor of defendant utility company where plaintiff's claim of negligent infliction of emotional distress was not supported by direct impact upon or threat of injury to a person, either the plaintiff or a loved one).

A few opinions from this court, however, have more liberally applied the modified

---

**6.** *Bowen v. Lumbermens Mut. Cas. Co.,* 183 Wis.2d 627, 517 N.W.2d 432 (1994).

impact rule and the relative bystander rule. In *Blackwell v. Dykes Funeral Homes, Inc.*, 771 N.E.2d 692 (Ind.Ct.App. 2002), *trans. denied,* the court reversed an entry of summary judgment in favor of the defendant funeral home. In that case, the plaintiffs sued the funeral home after their son's cremated remains were not entombed at a cemetery as requested. In fact, the niche the plaintiffs had visited, thinking it contained their son's ashes, was empty. It was undisputed that no physical impact had taken place. After discussing *Shuamber, Groves,* and *Bader,* the court wrote:

> "Here, we note that the Blackwells, *as bystanders,* claim that they suffered emotional distress that resulted from the alleged negligent conduct that involved a close relative's remains. Even though the tripartite test set forth [in *Groves* ] may be inapposite here, our supreme court's reasoning in *Groves* is persuasive and compelling. While there was no physical impact, the Blackwells have alleged serious emotional trauma and it is of a kind that a reasonable person would experience." *Blackwell,* 771 N.E.2d at 697 (emphasis supplied).

We understand the holding in *Blackwell* to be a fact-specific expansion of the *Groves* bystander rule in that the court specifically mentioned the plaintiffs as "bystanders," and referred directly to *Groves.*

In *Keim v. Potter,* 783 N.E.2d 731 (Ind. Ct.App.2003), and *Ryan v. Brown,* 827 N.E.2d 112 (Ind.Ct.App.2005), both plaintiffs brought suit for medical malpractice. In *Keim,* the court held that a mistaken diagnosis of hepatitis C, a life-altering and potentially deadly illness, was sufficient

"direct involvement" to allow a recovery for negligent infliction of emotional distress. 783 N.E.2d at 735. The court in *Ryan,* following *Keim,* held that the plaintiff could satisfy the modified impact rule where she alleged that the defendants committed medical malpractice which led to her miscarrying.[7] 827 N.E.2d at 121. So far as our research has revealed, aside from cases involving the bystander rule as set forth in *Groves* and expanded in *Blackwell,* the only cases in which a direct, physical impact was not a prerequisite for recovery for negligent infliction of emotional distress involved medical malpractice.

■ Turning to the present case, the designated evidence construed in the light most favorable to Lachenman reveals no direct physical impact to her. Lachenman appears to concede in her appellant's brief that she did not sustain any bodily injury. Appellant's Brief at 12. She testified in her deposition that no one was bitten or injured during the attack which resulted in her dog's death, and she does not allege medical malpractice. Thus, we conclude that she fails to meet the requirements of the modified impact rule.

■ We also conclude that Lachenman fails to fit within the bystander rule. Lachenman is correct to note that the bystander rule does not require that the plaintiff witness a severe injury only to a spouse, parent, child, grandparent, grandchild, or sibling; the rule also includes "loved one[s] with a relationship to the plaintiff analogous" to such persons. *Groves,* 729 N.E.2d at 572. However, we cannot agree with Lachenman's argument that she meets the requirements of the

---

7. In *Delta Airlines v. Cook,* 816 N.E.2d 448 (Ind.Ct.App.2004), *aff'd upon reh'g,* 821 N.E.2d 400 (Ind.Ct.App.2005), the court further backed away from a strict enforcement of the impact rule. However, our Supreme Court granted transfer in *Cook,* thereby vacating the opinion. *See Atlantic Coast Airlines v. Cook,* 831 N.E.2d 748 (Ind. May 26, 2005) (table).

bystander rule because the rule "clearly covers her beloved pet." Appellant's Brief at 17. We are not willing to expand the bystander rule to include pets, however beloved by their owners. Such an expansion, if warranted, would be the prerogative of our Supreme Court. We therefore reject the notion that witnessing the death or severe injury of a pet is sufficient direct involvement to allow a claim of negligent infliction of emotional distress. Indeed, if witnessing the death or severe injury of a unknown third party, or perhaps even an acquaintance, is insufficient to give rise to a claim of negligent infliction of emotional distress under the rule announced in *Groves*, then we cannot say that witnessing the death or severe injury of an animal could give rise to such a claim.

■ We further note that although many pets are beloved by their owners, they remain property. The plaintiffs in *Ketchmark, supra,* lost heirlooms, photos, and a family home during a natural gas explosion. In rejecting the plaintiffs' claim of negligent infliction of emotional distress, the court in *Ketchmark* observed that we have generally refused to allow recovery for emotional distress where there has been only an economic loss. *See* 818 N.E.2d at 524–25. The loss of a pet dog is similarly only an economic loss which does not support a claim of negligent infliction of emotional distress. In short, the trial court did not err in granting summary judgment in favor of the Stices upon Lachenman's claim of negligent infliction of emotional distress.

### C. Claims under Indiana Code § 15–5–12–3

■■ Lachenman argues that the trial court erred in granting summary judgment in favor of the Stices with regard to her claim under I.C. § 15–5–12–3. Lachenman's argument on this point is unclear. As best we are able to discern, however, Lachenman's main contention is that by violating Section 3, the Stices were negligent per se. The unexcused or unjustified violation of a duty prescribed by a statute or ordinance constitutes negligence per se if the statute or ordinance is intended to protect the class of persons in which the plaintiff is included and the statute or ordinance is intended to protect against the risk of the type of harm which has occurred as a result of its violation. *Am. United Life Ins. Co. v. Douglas*, 808 N.E.2d 690, 704 (Ind.Ct.App.2004). Thus, a threshold issue is whether the statute or ordinance at issue was indeed violated. Here, I.C. § 15–5–12–3 states in relevant part that it is a Class C misdemeanor if an owner of a dog recklessly, knowingly, or intentionally fails to take reasonable steps to restrain the dog and the dog enters property other than the owner's property and, as a result of the failure to restrain the dog, the dog "bites or attacks another person resulting in unprovoked bodily injury to the other person."

Lachenman argues that this statute includes "attacks of the property owner's pets on the property owner's home property." Appellant's Brief at 26. This argument is without merit. The plain language of I.C. § 15–5–12–3 requires the recklessly unrestrained dog to bite or attack another *person* resulting in unprovoked bodily injury *to the other person*. As noted, Lachenman effectively admits in her brief that she sustained no bodily injury, and she stated in her deposition that no person was bitten or hurt in the attack that killed her dog. Simply put, I.C. § 15–5–12–3 is inapposite.[8] Because of this, we also reject

8. Lachenman makes no direct challenge to the trial court's summary judgment ruling

with regard to Lachenman's claim based upon I.C. § 15–5–12–1. We nevertheless note

Lachenman's suggestion that violation of this statute supports her claim for damages based upon emotional distress.

### D. Violation of Association Regulations

Lachenman further claims that the Stices were negligent per se as a result of their violation of the Hidden Valley Lake Property Owner's Association rules and regulations regarding dogs. Lachenman attached to her complaint a copy of the Hidden Valley Lake "Dog Control Guidelines." Appellant's App. at 19. Mr. Miller's deposition testimony revealed that after the attack which killed Lachenman's dog, the Association declared the Stices' German Shepard dog to be a vicious dog and fined the Stices for failing to follow the guidelines. In support of her position, Lachenman cites *Plesha v. Edmonds ex rel. Edwards*, 717 N.E.2d 981 (Ind.Ct.App. 1999), *trans. denied*, in which the defendants violated a municipal ordinance regarding control of animals when their dog attacked a boy walking in their yard. The ordinance at issue required that all dogs were to be "kept under restraint." *Id.* at 986. The court held that the ordinance did not limit a dog owner's duty of reasonable care, but defined the duty. *Id.*

Here, there is no designated evidence suggesting that the Hidden Valley Lake guidelines are the equivalent of a municipal ordinance. Indeed, all indications are that the authority promulgating the guidelines is a property owner's association. Lachenman cites no authority for the proposition that violation of a property owner's association regulation supports a determination of negligence per se; neither has our research revealed any such authority. It has been held, however, that violation of an administrative regulation does not constitute negligence per se, but such violation may be generally considered as evidence of negligence for a jury to consider. *Beta Steel v. Rust*, 830 N.E.2d 62, 73–74 (Ind.Ct.App.2005); *Vandenbosch v. Daily*, 785 N.E.2d 666, 670 (Ind.Ct.App. 2003); *Zimmerman v. Moore*, 441 N.E.2d 690, 696 (Ind.Ct.App.1982); *see also Jones v. City of Logansport*, 436 N.E.2d 1138, 1148 (Ind.Ct.App.1982) (violation of OSHA regulations which were incorporated by reference into contract between parties to relieve them from drawing up their own construction guidelines was a violation of contract terms which, while not negligence per se, could be considered as evidence of negligence); *cf. Indian Trucking v. Harber*, 752 N.E.2d 168, 172 (Ind.Ct.App.2001) (violation of federal regulations which were incorporated by reference in Indiana Code supported finding of negligence per se); *Dawson ex rel. Dawson v. Long*, 546 N.E.2d 1265, 1268 (Ind.Ct.App.1989) (in order for trier of fact to determine negligence per se, there must be evidence of a violation of a statute or ordinance). *But see Town of Montezuma v. Downs*, 685 N.E.2d 108, 116 (Ind.Ct.App.1997) (violation of federal exposed pipeline regulations established negligence per se); *Imel v. Thomas*, 585 N.E.2d 712, 714 (Ind.Ct.App. 1992) (stating that violation of safety regulation or ordinance is negligence per se) (citing *Witham v. Norfolk & W. Ry. Co.*, 561 N.E.2d 484, 485 (Ind.1990) (holding only that proof of violation of safety regulation creates rebuttable presumption of negligence)).

 In *Duke's GMC, Inc. v. Erskine*, 447 N.E.2d 1118, 1124 (Ind.Ct.App. 1983), the court held that the recognized rules of a sport are at least indicia of the standard of care which those who play the

that this section too requires that a person be bitten and is therefore inapplicable to the present situation.

sport owe to each other. The court further held that while violation of such rules may not be negligence per se, such violation may be evidence of negligence. *Id.* The same thing can be said with regard to Lachenman's claims that the Stices violated the Association's dog control guidelines. Violation of property owner's association rules and regulations will not support a determination of negligence per se, but a violation could be evidence of negligence. Therefore, to the extent that the trial court's summary judgment ruling was based upon Lachenman's claim of negligence per se, we affirm. However, we do not agree that violation thereof is totally irrelevant to Lachenman's standard claim of negligence. Upon remand for trial on the remaining issues, evidence regarding any violation of the guidelines could be submitted to the trier of fact as evidence of the Stices' negligence.

### E. Potential Breeding Income

In her complaint, Lachenman sought to recover, "Loss of future breeding income figured at one litter of four (4) pups for each of the next seven (7) years at $500.00 per pup ($14,000.00), as Plaintiff's dog was registered in the stud files of the National Kennel Club." Appellant's App. at 17. Upon summary judgment, the Stices argued that damages for unborn animals is not recoverable and that Lachenman's claim of future breeding income was too speculative. Lachenman only briefly mentioned the issue of potential breeding income in her response to the trial court, as

part of her argument regarding the sentimental value of her dog and in passing in her conclusion.[9] In its order on summary judgment, the trial court ruled that Lachenman could not be compensated for future breeding income which might have been generated by her dog. Although Lachenman complains about this ruling several times in her brief, she never fully develops an argument as to why the trial court's ruling was in error. We would therefore be justified in holding this argument waived for purposes of appeal. *See* Ind. Appellate Rule 46(A)(8)(a).[10] Waiver notwithstanding, we cannot say that the trial court erred.

With regard to the trial court's rulings regarding evidence of future breeding income, we first note that although the trial court did exclude evidence of such, it had earlier granted summary judgment upon Lachenman's claim for damages regarding the loss of potential breeding income. We therefore review this issue as whether the trial court was correct in granting summary judgment. In her brief, Lachenman refers us to no designated evidence regarding future breeding income, but our review of the record reveals that the portions of Lachenman's deposition testimony, which was designated as evidence, did mention the loss of future breeding income. Lachenman testified that she had never bred her dog before.[11] She agreed that her loss of future breeding income was "pretty hard to determine," and stated that her damage estimates were "aver-

**9.** The issue of future breeding income was not mentioned in Lachenman's supplemental response to the Stices' motion for summary judgment.

**10.** The trial court also excluded evidence regarding the pedigree and breed of the dog. Although Lachenman briefly claims that the trial court erred in so doing, an argument with which we do not necessarily disagree,

she never develops a cognizable argument as to why the trial court was in error. Thus, we will not consider this issue. *See* App. R. 46(A)(8)(a).

**11.** Although Lachenman stated that she had provided stud services with one of her other dogs in the past, she had never bred a female dog before.

age[s]." Appellant's App. at 30. When asked how she would determine her loss of future breeding income, she stated, "I know Jack Russell terriers sell from [$]350 to $500, depending on their lineage. And basically she would probably have four puppies, but it's hard to determine because she's never really had a litter." *Id.* In fact, Lachenman had only recently begun to research the possibility of breeding her dog and stated that such would be a "learning experience." *Id.* Lachenman further stated that Jack Russell terriers usually have four to six pups, and that she would have had to have given one pup up to whomever provided the stud services. Lastly, she stated that she would probably have bred her dog for six or seven years.

Based upon this designated evidence, we agree with the Stices that Lachenman's claim of damages with regard to future breeding income was speculative. The Stices refer us to *Greives v. Greenwood,* 550 N.E.2d 334, 338 (Ind.Ct.App. 1990), in which the court held that where damages were allowed for injury to or loss of cows, such damages could not also be allowed for the loss of unborn calves carried by them, "since unborn calves have no market value and a separate allowance for them would amount to double damages." While not entirely on point, the *Greives* court did note the rule that a jury may consider lost profits only if there is sufficient evidence to prevent mere speculation. *Id.* at 337. Here, the designated evidence regarding the breeding potential of Lachenman's dog was wholly speculative. Lachenman's testimony betrayed the speculative nature of her claim for breeding income when she admitted that her dog

would "probably" have had four puppies but that such was "hard to determine" because her dog had never been bred before. Appellant's App. at 30. We cannot say that the trial court erred in granting summary judgment in favor of the Stices with respect to Lachenman's claim she lost $14,000 in future breeding income because the designated evidence with regard to this claim was speculative in nature.[12]

II

*Violent Propensity Evidence*

Lachenman also challenges the trial court's rulings regarding the admissibility of certain evidence. The admission or exclusion of evidence is a determination entrusted to the discretion of the trial court, and we will reverse a trial court's decision only when the court has abused its discretion. *Potts v. Williams,* 746 N.E.2d 1000, 1007 (Ind.Ct.App.2001). Upon appeal, Lachenman specifically contends that the trial court erred in excluding evidence regarding the two incidents involving the Stices' dogs which occurred after the attack on Lachenman's dog. The Stices counter that the trial court was correct to exclude such evidence in that the subsequent attacks could not be relevant to the question of the alleged vicious propensity of their dogs and their knowledge thereof at the time of the attack on Lachenman's dog.

In support of her claim that the trial court should have allowed evidence of the subsequent attacks, Lachenman cites *Hardsaw v. Courtney,* 665 N.E.2d 603, 609 (Ind.Ct.App.1996), wherein the court stat-

---

12. This is not to say, however, that a dog with breeding potential might not have a fair market value higher than that of a neutered or spayed animal. Therefore, evidence that a specific animal had breeding potential or was a breeder could be relevant to the issue of the fair market value of that specific animal. Our holding is limited to affirming the trial court's summary judgment ruling upon Lachenman's claim that she lost $14,000 because her dog would have littered four puppies per year for seven years.

ed, "we cannot agree with the [defendants] that the jury's consideration of vicious propensity here should have been limited only to the dog's prior acts." At first blush, this statement could be read to support Lachenman's claims. However, at issue in *Hardsaw* was whether the jury was correctly instructed that it could consider the dog's behavior on the incident leading to the claim of negligence to infer vicious propensity and the owner's knowledge thereof. Specifically, in *Hardsaw*, the jury was instructed that a dog which, through sudden pain or fright, involuntarily snaps and, having done so proceeds to savage its victim, is demonstrating vicious propensity. *Id.* at 608. The defendants claimed the instruction was in error in that the proper question before the jury should have been what was known to the defendants at the time of their dog's attack, i.e. what their dog had done in the past, and that their dog's attack on the plaintiff was insufficient to demonstrate vicious propensity or their knowledge thereof. *Id.* at 609. Thus, the question in *Hardsaw* was whether the dog's behavior during the attack on the plaintiff was relevant evidence regarding vicious propensity, or whether only evidence regarding the dog's prior behavior could be considered. It is in this context that the court held that the jury's consideration of vicious propensity should not have been limited only to the dog's prior acts. We do not read *Hardsaw* as supporting the notion that *subsequent* acts by a dog are relevant to the question of a dog's vicious propensity, and the dog's owner's knowledge thereof, at the time of the attack in question.

Furthermore, we agree with the Stices that the prejudicial effect of evidence of subsequent attacks would outweigh whatever little relevance such evidence would possess. The relevant question here is one of the vicious propensity of the Stices' dogs and whether the Stices knew or should have known of this vicious propensity at the time of the alleged negligence—the attack on Lachenman's dog. *See Poznanski ex rel. Poznanski v. Horvath,* 788 N.E.2d 1255, 1259 (Ind.2003) (generally, owners of domestic animals may be held liable for harm caused by their pet only if the owner knows or has reason to know that the animal has dangerous propensities). We see little relevance in the dogs' subsequent behavior on this issue. In fact, we fail to see how the subsequent attacks can have any bearing upon the Stices' knowledge at that time. Thus, any evidence regarding the subsequent attacks involving the Stices' dogs would be unduly prejudicial compared to the relevance of such evidence, which is minimal or nonexistent.

We find support for our conclusion in *Wohlwend v. Edwards,* 796 N.E.2d 781 (Ind.Ct.App.2003), wherein the plaintiff, who was injured in an accident allegedly caused by the defendant's driving while intoxicated, wished to present evidence in support of her claim for punitive damages that the defendant, after the accident involving the plaintiff, was subsequently arrested twice for operating a vehicle while intoxicated. We held that the relevance of the evidence of the defendant's subsequent conduct was substantially outweighed by the danger that the jury would use such evidence to punish the defendant for his subsequent acts instead of the conduct which gave rise to the plaintiff's damages. *Id.* at 787. In the present case, we find no error in the trial court's decision to exclude evidence regarding the subsequent attacks by the Stices' dogs.

III

*Sentimental Value*

■ The trial court ruled that Lachenman would be precluded from presenting

evidence regarding future breeding income, pedigree information, photographs of her dog, and any evidence of her dog's value in excess of its purchase price and the veterinary bills Lachenman incurred as a result of the attack on her dog. Upon appeal, Lachenman claims that she should be allowed to proceed on a claim and present evidence regarding the value of her dog which exceeds its purchase price and the veterinary costs she incurred. The Stices counter that a dog is personal property and that the correct measure of damages for the loss of personal property is the fair market value of that property. *See* Ind.Code § 15–5–10–1 (Burns Code Ed. Repl.2005) (dogs declared to be personal property subject to taxation the same as other personal property); *Ridenour v. Furness*, 546 N.E.2d 322, 325 (Ind. Ct.App.1989) (damages for total destruction to personal property, including animals, are measured by the fair market value of the property at the time of loss).

Lachenman cites several older Indiana cases claiming they support the contention that a dog has a value much greater than fair market value. In *State v. Sumner*, 2 Ind. 377 (1850), the defendant was indicted for maliciously killing a dog valued at ten dollars. The trial court quashed the indictment upon the grounds that a dog was not regarded by law as having any value. Upon appeal, the court discussed the common law distinction between tame animals, wild animals, and those animals, whether wild or tame, which "are of so base a nature as not to be the subject of larceny." *Id.* at 378. The court ultimately concluded, "A dog, then, being a domestic animal, is a subject of absolute property, and, though not intrinsically for his flesh, yet extrinsically for his use, being of some, we might say of much, value, the killing of him under our statute, is an indictable offence."

*Id.* Thus, the question in *Sumner* was whether a dog had *any* value such that the killing of a dog was indictable as the malicious destruction of property. The court held that a dog had value as property, but we do not read the case to support compensating the owner of a dog at a value higher than the fair market value of the dog. Similarly, in *Kinsman v. State*, 77 Ind. 132 (1881), the defendant, charged with killing the dog of another, claimed that a dog was not necessarily an animal of value and could not support a conviction for malicious destruction of property. The court noted that under statutes in force at that time, dogs were taxed as property. *Id.* at 135. The court then stated, "It may well be said, we think, that any article of property which the law subjects to taxation is *prima facie* an article of value." *Id.*

Lachenman claims that in the case of *Lowell v. Gathright*, 97 Ind. 313 (1884), the court upheld an award of $200 for the killing of a dog. To be sure, the plaintiff recovered $200 as a result of the defendant's killing of the plaintiff's dog, but the value of the dog was not a question in *Lowell*. Instead, the defendant in *Lowell* claimed, and the court rejected, that he had a right to shoot the dog because the dog was not tagged pursuant to statute. *Id.* at 314–15. In the other case relied upon by Lachenman, *Jacquay v. Hartzell*, 1 Ind.App. 500, 27 N.E. 1105 (1891), the court wrote that "[o]ne who willfully and maliciously kills a dog which is not vicious or dangerous in its disposition and habits, and is not engaged in committing damages, is liable to the owner for the *fair value* of the animal." 27 N.E. at 1105 (emphasis supplied). These cases do not provide support for Lachenman's claim that she may recover damages in excess of the fair market value of her dog.[13] Instead, they provide support for the posi-

---

13. Our research has revealed that in *Seidner* *v. Dill*, 137 Ind.App. 177, 206 N.E.2d 636

tion that fair market value is indeed what she may recover.[14]

Whatever support these cases provide to the notion that dogs, as beloved pets, have a certain "worth" or "value" beyond their market value, we do not take them to be support for the notion that under the law a dog owner may recover more than the fair market value of the dog when killed. However unfeeling it may seem, the bottom line is that a dog is personal property, and the measure of damages for the destruction of personal property is the fair market value thereof at the time of the destruction. *See Ridenour*, 546 N.E.2d at 325; *Harlan Sprague Dawley, Inc. v. S.E. Lab Group, Inc.*, 644 N.E.2d 615, 621 (Ind.Ct.App.1994) (noting that measure of damages for destruction of animals is fair market value thereof at time of destruction), *trans. denied.*

Furthermore, we disagree with Lachenman that *Mitchell v. Mitchell*, 685 N.E.2d 1083 (Ind.Ct.App.1997),[15] and *Campins v.*

*Capels*, 461 N.E.2d 712 (Ind.Ct.App.1984), support a claim for recovery of the "sentimental value" of a dog. Both of these cases did uphold the award of damages which were based upon sentimental value, which included family photographs and videos in *Mitchell* and trophy rings in *Campins*. However, both cases limited their holdings:

> "Concerned with the danger of exaggerated sentimentality, the [*Campins*] court stated that it was 'referring to the feelings generated by items of almost purely sentimental value such as heirlooms, *family papers and photographs, ....*'" *Mitchell*, 685 N.E.2d at 1088 (quoting *Campins*, 461 N.E.2d at 721 (citations omitted)).

Whether we agree with the holdings of these cases or not, we conclude that they do not apply to the case before us. A family dog may well have sentimental value, but it is not an item of almost purely sentimental value such as an heirloom.[16]

(1965), *overruled by Puckett v. Miller*, 178 Ind. App. 174, 381 N.E.2d 1087 (1978), the court was faced with a situation in which the defendant had shot and killed the plaintiff's dog which was on or near the defendant's property. In discussing the value of a dog, the court wrote that "[d]uring the latter half of the past century legislation and court decisions in the state of Indiana have evidenced the value which has been placed upon dogs over and above their intrinsic value." 137 Ind.App. at 185–86, 206 N.E.2d at 640. We recognize that this case was overruled, but still note that the court cited for support *Sumner, Kinsman, Lowell,* and *Jacquay,* discussed *supra.* The *Seidner* court did also cite *Dinwiddie v. State*, 103 Ind. 101, 2 N.E. 290 (1885). In that case, the defendant was charged with maliciously killing a dog belonging to another. There was no dispute that the defendant had shot and killed the dog, and the court held that there was no evidence that the dog was damaging the defendant's property or engaging in any behavior which would justify the shooting. *Dinwiddie*, 103 Ind. at 104, 2 N.E. at 292. With regard to the defendant's claim that the trial court erred in not allowing him

to prove the value of the dog, the court held, "it is not material, under the statute upon which this prosecution is based, what the value of the dog may have been, or that he was of any value." *Id.*

**14.** Several of the out-of-state cases cited by Lachenman simply hold that the killing of a pet dog may give rise to a claim of negligent infliction of emotional distress or intentional infliction of emotional distress. As discussed, under Indiana law, we conclude that the facts of the present case do not allow Lachenman to proceed upon such claims.

**15.** Our Supreme Court granted transfer in *Mitchell. See* 698 N.E.2d 1194 (Ind.1998) (table). Upon transfer, the court affirmed the trial court on the issue of attorney fees, but summarily affirmed the opinion of the Court of Appeals in all other respects. *See* 695 N.E.2d 920, 925 (Ind.1998).

**16.** Lachenman testified in her deposition that the purchase price of her dog was approximately $500—not an insignificant sum.

In short, we cannot say that the trial court's ruling excluding evidence regarding sentimental value, or value other than fair market value, was in error.

## Conclusion

At times in her brief, Lachenman seems to argue that the trial court rejected all of her claims. We emphasize that the trial court's grant of summary judgment left intact Lachenman's claim of negligence against the Stices with regard to the actual value of her dog, i.e. not including emotional distress, "sentimental" value, etc. The trial court limited evidence of the value of Lachenman's dog to the purchase price and veterinary bill. To the extent that the trial court's ruling meant to limit Lachenman's claims to the fair market value of her dog, it was correct. However, we do not agree that the purchase price, which is obviously relevant to the question of fair market value, is the *only* admissible evidence regarding fair market value. Thus, upon remand, the only issues remaining for trial are those of the Stices' liability and whether and to what extent they caused the loss of Lachenman's dog, recovery for which is limited to the fair market value of the dog.

The judgment of the trial court is affirmed in part, reversed in part, and the cause is remanded for proceedings consistent with this opinion.

NAJAM, J., and RILEY, J., concur.